IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| US FOODS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:15-cv-08672 |
| v. | ) | |
| | ) | |
| PERFORMANCE FOOD GROUP | ) | |
| COMPANY, DON HARRIS and | ) | |
| IRA FENTON | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff US Foods, Inc. ("US Foods"), by and through its attorneys, Proskauer Rose LLP, and against Defendants Performance Food Group Company ("PFG"), Don Harris and Ira Fenton (collectively, "Defendants"), alleges as follows:

**I.    Introduction**

1.    Don Harris and Ira Fenton, two of US Foods' top sales employees in the Chicago area, left US Foods for PFG, its direct competitor, with US Foods' highly sensitive confidential and proprietary information, including product pricing and margin information.    Harris downloaded confidential information to USB thumb drives from his US Foods laptop and e-mailed confidential information from his US Foods account to a personal account shortly before his resignation.    Upon joining PFG, Harris and Fenton immediately embarked on a scheme to circumvent their customer non-solicitation agreements[1] by swapping US Foods accounts for which they had responsibility with a shill employee of PFG, Josh Bernicchi—who recently joined US Foods.    This scheme was directly facilitated by a PFG manager, Matt Tonozzi.

---

[1] The agreements, titled Non-Solicitation and Non-Disclosure Agreement, are collectively referred to as the "Agreements," or, individually, the "Agreement."  Copies are attached as Exhibit A.

2.      More specifically, shortly after Harris and Fenton left US Foods for PFG, they worked with Tonozzi to arrange a meeting with Bernicchi and his manager, David Jenkins, in which they told Bernicchi that they would give him numerous accounts that they handled at US Foods yielding approximately $150,000 per week, and that they had already worked with the customers to set up the accounts and prices.  In fact, they had negotiated the prices by undercutting US Foods based on their knowledge of US Foods' confidential pricing.  In the following weeks, Fenton visited more than ten US Foods customers with Bernicchi.  Fenton repeatedly told Bernicchi to keep this arrangement confidential, knowing it contravened his contractual obligation to refrain from directly or indirectly soliciting US Foods accounts on which he worked.  This scheme has severely damaged US Foods, causing it to lose some customers entirely, and to lose substantial sales from others.

3.      In addition, Harris and Fenton wantonly violated their employee non-solicitation agreements by soliciting multiple US Foods employees to join them at PFG, including Nick Galanis, Martin Cabrera and Bob Wurtz.  PFG tortiously induced this conduct, having full awareness of Harris's and Fenton's contractual non-solicitation obligations.

II.      **The Parties**

4.      <u>US Foods</u>.  US Foods is a Delaware corporation with its principal place of business in Rosemont, Illinois.  US Foods is a leading distributor of food and non-food products to customers in the restaurant, hospitality and healthcare industries.

5.      <u>Performance Food Group</u>.  PFG is a Delaware corporation with its principal place of business in Richmond, Virginia.  PFG maintains an office in Montgomery, Illinois.  PFG is also a food service distributor, and is a direct competitor of US Foods.

6.      <u>Don Harris</u>.  On information and belief, Harris is a citizen of Wisconsin, residing in Bristol, Wisconsin.  Harris was employed by US Foods from December 1998 until December 5, 2014, most recently holding the position of District Manager.

7.      <u>Ira Fenton</u>.  On information and belief, Fenton is a citizen of Illinois residing in Zion, Illinois.  Fenton was employed by US Foods from July 2006 until November 28, 2014, and most recently held the position of Territory Manager.  Fenton was supervised by Harris while the two were employed by US Foods.

## II.      Jurisdiction And Venue

8.      This Court has jurisdiction over this dispute as US Foods asserts claims against at least one Defendant under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, which provides federal question jurisdiction.   Additionally, this Court has supplemental jurisdiction over US Foods' remaining claims pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the claims occurred in this judicial District, and Harris and Fenton consented to this District for purposes of venue in their respective Agreements.  (Exhibit A.)

## III.     Harris's and Fenton's Respective Positions At US Foods

10.     As a District Manager, Harris was responsible for developing sales strategy for US Foods in the Chicago North Shore district.  In November 2014, he supervised nine Territory Managers responsible for the North Shore area of Chicago, and worked with them to develop their strategies, including strategies to retain and grow clients and obtain new clients.

11.     Harris also worked with his fellow District Managers to develop strategy for US Foods' operations throughout the entire Northern Illinois region.  For example, on a weekly

3

basis, Harris met with three other District Managers to specifically collaborate on and discuss new business opportunities within their respective territories and what customers and opportunities the various Territory Managers reporting to those District Managers were working on.

12.     When his fellow District Managers or the Territory Managers reporting to him were on vacation or otherwise unavailable, Harris would fill in for those employees. As a result, Harris was not only intimately involved with and knowledgeable about the strategic sales plans for Northern Illinois on macro level, he had direct access to information on a micro level about US Foods' customer accounts throughout Northern Illinois.

13.     Harris was one of the most successful District Managers within the Chicago area, and was the top suburban District Manager in the Chicago area at the time of his resignation.

14.     At the time of his departure from US Foods, Harris oversaw approximately $40,000,000 in business for the company each year, representing 10% of US Foods Chicago's total sales and 20% of the total street sales. In the last year of his employment, his district had $6,400,000 in profit.

15.     As a Territory Manager, Fenton was responsible for developing and serving new customer accounts within his assigned territory. His sales territory primarily consisted of the Chicago North Shore area.

16.     At the time of his departure from US Foods, Fenton oversaw approximately $8,000,000 in annual sales for the company each year. This represented 5% of the total street sales for the Chicago division. His territory had $1.4 million in profit in his last year of employment.

17.     Harris supervised Fenton while the two were employed by US Foods.

IV.     **US Foods' Confidential And Proprietary Information**

18.     In the course of performing their duties for US Foods, Harris and Fenton were entrusted with access to US Foods' confidential and proprietary information, including: product pricing; price margins; business strategy regarding current and prospective customers; specific orders and needs of customers; customer order guides; customer pricing history; concerns, priorities, and other information about customers that could only be learned through considerable time, effort and experience working for the customers.

19.     US Foods undertakes extensive efforts to protect its confidential and proprietary information. For example, Territory and District Managers can only access information about the accounts and customers within their respective areas of responsibility through US Foods computer systems, which are password protected, and the computer system records when employees access the information.

20.     Additionally, US Foods maintains and strictly enforces a Code of Conduct, which sets forth employees' obligations to keep US Foods proprietary and confidential information confidential.

V.      **Harris's And Fenton's Customer And Employee Non-Solicitation And Non-Disclosure Agreement With US Foods**

21.     In a further effort to protect its proprietary and confidential information and key assets, US Foods requires all Territory and District Managers to execute a Non-Solicitation and Non-Disclosure Agreement.

22.     On November 13, 2013, Harris executed the Agreement in exchange for good and valuable consideration.

23.     On November 13, 2013, Fenton executed the Agreement in exchange for good and valuable consideration.

24.     The Agreement contains a confidentiality provision stating, in pertinent part:

"Confidential information" means any information (in whatever form and whether or not recorded in any media) relating to the Business of the Company (whether constituting a trade secret or not) and including, but not limited to, customer and vendor lists or other documents containing the names and/or job titles of the principal contact(s) of each customer and/or vendor; customer and vendor documents, routing arrangements, files, purchase and account history; vendor information; route lists of sales employees; pricing, margins, sales allowances, discounts, incentives and pricing strategies and policies; invoices; procurement strategies and pricing; marketing and product information; order guides or histories; sales data for any employee, product, customer or territory; sales and delivery schedules; credit terms, policies and information, including invoicing and payment records; information on customer or vendor preferences; promotional programs; financial information of the Company or its customers or vendors; the terms, conditions and structures of the Company's contracts and agreements with customers, vendors and suppliers; information pertaining to the Company's methods of operation, processes, strategies and techniques, including strategies for identifying and satisfying the needs of specific customers and types of customers; and lists containing personal and personnel information about other employees of the Company, including but not limited to their home and business telephone, mobile and pager numbers, addresses, compensation terms, customers served by and vendors assigned to such employees, and job performance; which (i) is or has been disclosed to Employee (or of which Employee became aware) as a consequence of or through his or her relationship to the Company, (ii) has value to the Company or would be of value (actual or potential) to a competitor of the Company, and (iii) is not generally known, or readily available by lawful means, to the public (including compiled information that is not publicly available in such a consolidated form) . . .

At no time, either during or after the termination of employment, shall Employee directly or indirectly obtain, disclose or use for Employee or any Person, or aid others in obtaining, disclosing or using any Confidential Information of the Company, other than as may be required in the performance of duties for and as authorized by the Company. All Confidential Information is and shall remain the sole property of the Company. . . .

All records, files, customer order guides, pricelists, photo/videographic materials, computers, and computer related equipment (e.g., hardware, software, disks, electronic storage devices, etc.) . . . personal data assistants . . . equipment . . . or other tangible material . . . and all other documents, including but not limited to Confidential Information, Employee receives, acquires, produces or has access to as a result of his or her employment with the Company . . . are the exclusive property of the Company. Upon the termination of Employee's employment, Employee shall return to the Company all Property of the Company and all copies thereof in Employee's possession or control.

(Exhibit A.)

6

25.     The Agreement also prohibits the solicitation of US Foods' customers for a period of one year following the termination of employment.  It states, in pertinent part:

> For the one (1) year period following the termination of Employee's employment with the Company, Employee shall not, ***directly or indirectly***, (for Employee or any other Person, whether as an employee, owner, consultant, independent contractor, or in any other capacity) for the purpose of providing products or services competitive with those conducted, authorized, offered or provided by the Company, solicit, market, service, contact, sell to or attempt to sell to any Person(s):
>
> (1) to whom Employee sold products or services on behalf of the Company at any time during the Pre-Termination Period[2], including sales performed while Employee was in training or providing vacation or leave coverage for another Associate;
>
> (2) to whom the Company sold products or services and with whom Employee had contact on behalf of the Company in connection with such sale at any time during the Pre-Termination Period; or
>
> (3) to whom the Company sold products or services at any time during the Pre-Termination Period and which sale was made through any Associate whom Employee directly or indirectly managed or supervised (at any level of management or supervision); or
>
> (4) with regard to whom, at any time during the Pre-Termination Period, Employee (or any Associate whom Employee directly or indirectly managed or supervised, at any level of management or supervision): (1) participated in the preparation of a written sales proposal or bid containing Confidential Information to such Person on behalf of the Company; (i) participated in the setting of prices, margins, or credit terms for such Person(s) on behalf of the Company; or (iii) used or received or created or reviewed any Confidential Information relation to such Person(s) on behalf of the Company; . . .

(Exhibit A at ¶ 5) (emphasis added.)

---

[2] "Pre-Termination Period" is defined in Paragraph 2(f) of the Agreement as "the eighteen (18) month period immediately prior to the termination of Employee's employment with the Company."  (Exhibit A at ¶ 2(f)).

26.     In addition, the Agreement prohibits the solicitation of employees for a period of one year following the termination of employment:

> For a period of one (1) year following Employee's termination of employment with the Company, Employee will not, directly or indirectly, on behalf of Employee or for any other Person, entice, induce, encourage or solicit or attempt to entice, induce, encourage or solicit any individual then employed by the Company and with whom the Employee had work-related dealings as a co-employee of the Company to leave such employment with the Company . . . nor will the Employee hire any such individual for any other Person during the same one-year period following the Employee's termination.

(Exhibit A.)

## VI.  Fenton Resigned From US Foods In November 2014 To Work For PFG

27.     On or about November 14, 2014, Fenton notified US Foods that he would be resigning from US Foods.

28.     Fenton's last day of work for US Foods was November 28, 2014.

29.     Fenton disclosed during his exit interview with Dan Gilroy (US Foods' Chicago Area President) that he had been in direct communication with PFG about joining the company for six months prior to announcing his resignation from USF, since approximately June 2014.

30.     Fenton also disclosed to Gilroy during the exit interview that he had decided to leave US Foods approximately 30 days earlier, on or about October 28, 2014.

31.     On information and belief, Fenton began working for PFG on or about December 1, 2014.

## VII.  Nicholas Galanis, Another Territory Manager Working Under Harris, Also Resigned in November 2014 To Work for PFG

32.     Also on November 14, 2014, Territory Manager Nicholas Galanis, whom Harris also supervised at US Foods, informed US Foods that he was resigning his employment.

33.     Galanis' last day of work for US Foods was December 4, 2014.

34.     Upon information and belief, Galanis began working for PFG on or about December 8, 2014.

## VIII.  Harris Told His Supervisor That He Would Try To Convince Fenton And Galanis To Continue Working With US Foods

35.     Shortly after Fenton and Galanis informed Mark Van Dam (Vice President of Street Sales), who was Harris' manager, that they were both resigning from US Foods, Harris told Van Dam that he would try to convince Fenton and Galanis to remain working at US Foods.

36.     Harris represented to US Foods that he tried to convince Fenton and Galanis to stay with US Foods but was unable to persuade them.

## IX.  Harris Resigned From US Foods Days Later—In Late November 2014—To Work For PFG

37.     Harris resigned from US Foods in late November 2014, to accept a position with PFG.

38.     On December 5, 2014, Peg Kautz (Human Resources Manager) conducted an exit interview with Harris.  At that meeting, Harris stated he had decided to accept the PFG offer on November 19, 2014—which was *before* he represented to USF that he would try to convince Fenton and Galanis to turn down their offers from PFG.

39.     Harris also disclosed to Kautz during the exit interview that he had been actively considering joining PFG for several months—since summer 2014.

40.     During that meeting, Harris told Kautz that he had no confidential or proprietary information belonging to US Foods in his possession.

41.     Hours after the meeting with Kautz ended, however, Harris called Kautz to state he actually did have two USB drives with US Foods' confidential information in his possession.

42.     Thereafter, on or about December 8, 2015, Harris returned two USB drives to Kautz by Federal Express delivery.

**X.     Forensic Analysis Of Harris's and Fenton's US Foods Computers and Harris's USB Devices Showed That He Removed Confidential And Proprietary Information**

43.     Shortly following Harris's and Fenton's respective resignations, US Foods engaged a forensic consultant, iDiscovery Solutions, to conduct a forensic review of Harris's and Fenton's respective laptop computers and the USB drives Harris sent to Kautz.

44.     The forensic review revealed that Harris inserted four different USB drives into his US Foods laptop shortly before his departure, the last being on November 20, 2014.

45.     Information that Harris downloaded to the USB thumb drives that he ultimately returned included US Foods' confidential, proprietary and trade secret information.

46.     For example, one of the thumb drives contained approximately 8 weeks of daily sales audits, daily snapshots of every transaction recorded in US Foods' system at the customer level in Harris' district—including quantity ordered, price of item, margin over cost, and special pricing attached to an item that was vendor funded or internally funded—which shows the strategy for the account, and thousands of transactions that would enable PFG to undercut pricing to take accounts away from US Foods.

47.     Harris also took purchasing information called "Descending Dollar Reports," which include all purchases, from the top-purchased items down to the least-purchased items, purchased by every customer in his $40,000,000 district.  He carefully downloaded each account into its own excel file in an organized format so that order guides could be built, pricing could be moved to the PFG system, and a strategy could be built to take the accounts over.

48.     When Descending Dollar Reports are captured and taken, as they were here, the probability of opening or taking an account away from US Foods increases substantially:  if a

customer can buy the same exact items for a lesser cost most customers would be more likely to change vendors. This information included every item purchased for a 1-year period for every account Harris managed, totaling approximately 300 accounts. This information also included manufacturer numbers that could easily be transferred in PFG's system to determine if the items were stocked at the local PFG facility, and if not, would provide a roadmap of items that would need to be brought into stock in order to service the account properly.

49.     Harris also took transportation files, which include sensitive information regarding accounts serviced by the division. Harris had access to this information to work in conjunction with the other district managers to make routing decisions in his own district as well as other districts that overlapped with his. The district managers work as a team to make decisions based on the value of the account to help route the trucks. District managers also took part in transportation meetings frequently to make decisions to determine which accounts need more service. District Managers also work with the customer service team throughout the day and receive routing information to make decisions when issues in the business arise that need to be resolved, and they take part in the decision making with respect to shifting stops. Since US Foods is in the service business, delivery is a key function of the business and the district managers are very involved in the transportation and decision making process around it. Transportation information from US Foods would give PFG a competitive advantage.

50.     In short, the sales, invoicing and routing data that Harris downloaded enabled him and PFG to undercut US Foods prices by slim margins. Further, knowledge of customer sales patterns and history would give Harris PFG a significant competitive advantage that PFG, as a new supplier, would not otherwise have.

51. Harris never returned to US Foods two of the USB drives that he inserted into his US Foods laptop in the months immediately preceding his resignation.

52. Forensic analysis also revealed that Harris e-mailed confidential documents from his US Foods account to his personal account in November 2014.

53. US Foods' investigation also suggests that Harris and Fenton took hard copy documents containing US Foods' confidential customer information, including information regarding orders, pricing and margins.

54. For example, Fenton was seen printing confidential documents in the US Foods office on a Sunday approximately 30 days before he resigned from US Foods. On information and belief, Fenton never went to the US Foods office on Sundays and it was highly unusual for Territory Managers to be in the office on Sundays.

55. Forensic analysis further showed that Fenton inserted a USB drive into his laptop on November 7, 2015, which was before he notified US Foods that he planned to resign, but after he had decided to join PFG.

56. Fenton never returned this USB drive to US Foods, but represented during his exit interview that he had returned all US Foods material to the company.

57. During the same time period, including October and November 2014, Fenton opened and accessed numerous confidential and proprietary US Foods files, including routing information related to several routes that he did not regularly service.

XI.     **Harris And Fenton, Though The Help Of PFG's Regional Sales Manager, Concocted And Executed A Scheme To Target US Foods' Accounts Using Confidential Information**

58.     In December 2014, Harris and Fenton met with then-PFG Territory Manager Josh Bernicchi, PFG Regional Sales Manager Matt Tonozzi, and PFG District Manager Dave Jenkins at the Crown Plaza Hotel in Northbrook, Illinois.

59.     At the meeting, Harris and Fenton explained to Bernicchi that they would have him manage accounts amounting to approximately $150,000 per week of business, which consisted of restaurants Harris and Fenton were responsible for while employed at US Foods.

60.     Harris and Fenton also told Bernicchi that they had already visited the accounts, negotiated competitive pricing, and completed credit applications with the customers on behalf of PFG, so Bernicchi could begin selling to the accounts immediately after an introduction through Fenton.

61.     At this meeting, Harris shared with Bernicchi a document showing each of the customer accounts at issue, including the weekly purchases of each of the accounts.

62.     Fenton gave Bernicchi order guides and pricing information that could be used to sell to these customers, representing that the prices had been created to strategically undercut the prices US Foods was charging customers for the same products.

63.     Among the accounts discussed in the meeting were:  Once Upon A Bagel Group; Kevin's Place; Norton's; The Lantern; and Gertrude B. Nelson.

64.     All of the foregoing entities were customers of US Foods for which Harris and/or Fenton had direct or indirect responsibility while employed by US Foods.  On information and belief, none of the foregoing entities had customer relationships with PFG at the time Harris and Fenton resigned from US Foods.

13

65.     Shortly after the December 2014 meeting, Bernicchi and Fenton visited the aforementioned accounts together.  Fenton introduced Bernicchi to clients as the new salesperson who would handle the account.

66.     Fenton also e-mailed to Bernicchi certain US Foods order guides.

67.     Fenton told Bernicchi that he should avoid e-mailing and texting Harris and Fenton and others regarding the scheme.

68.     Harris's and Fenton's strategy proved successful:  Bernicchi began managing the Norton's, Kevin's Place, Once Upon a Bagel and Gertrude B. Nelson accounts.

69.     Upon information and belief, Harris and Fenton have continued to share confidential US Foods information with PFG and its employees in order to successfully solicit their former US Foods customers, in violation of the Agreements.

**XI.     Bernicchi Left PFG To Work For US Foods In August 2015**

70.     In August 2015, Bernicchi resigned his employment with PFG and accepted a position with US Foods on August 29, 2015.

71.     US Foods recently confirmed the specifics of Harris's and Fenton's customer solicitation scheme and immediately commenced an investigation.

**XIV.    US Foods Repeatedly Tried To Persuade Defendants To Cease And Desist From Breaching The Agreement And Misappropriating Its Confidential Information**

72.     On December 1, 2014, Plaintiff contacted all three Defendants regarding their concern that Fenton and Harris were breaching their obligations under the Agreement and using US Foods' proprietary and confidential information to the benefit of PFG and the detriment of US Foods.  Thereafter, US Foods repeatedly sent PFG letters reiterating its concerns that Fenton and Harris were breaching their obligations under the Agreement.  It sought written assurances

14

that Defendants would abide by the contractual terms. PFG responded to the letters by indicating that no contractual violations or improper conduct had occurred.

73.     More specifically, the correspondence between the parties occurred as follows: (i) on February 10, 2015, US Foods identified Harris's and Fenton's prohibited customer solicitation attempts, on February 24, 2015, PFG responded, stating that no improper solicitations had occurred; (ii) on March 11, 2015, US Foods alerted PFG of additional prohibited solicitation attempts and again asked PFG to investigate the matter, on March 23, 2015, PFG denied that any improper solicitations had occurred; (iii) on April 1, 2015, US Foods alerted PFG of additional violations of Harris's and Fenton's customer non-solicitation provisions, on April 15, 2015, PFG again denied that any improper solicitations occurred; (iv) on May 29, 2015, US Foods brought additional improper solicitations PFG's attention, on July 1, 2015, PFG denied that any improper solicitations occurred; (v) on August 20, 2015, US Foods alerted PFG of further improper customer solicitations by Harris and Fenton, and on August 28, 2015, PFG denied that any improper solicitations had occurred.

## XV.     Harris's And Fenton's Respective Breaches Of Their Customer Non-Solicitation Agreements

74.     On information and belief, in addition to the elaborate scheme described above, Harris and Fenton flouted their obligations to US Foods by calling on customers subject to the non-solicitation provisions of the Agreement beginning just days after their resignations.

### A.     Harris's and Fenton's Prohibited Customer Solicitations

75.     Based on witness accounts from US Foods employees and information provided by customers and others, and on information and belief, the following are examples of the US Foods customers that Harris and Fenton solicited on behalf of PFG in breach of their Agreements, using US Foods' confidential and proprietary information:  Rhapsody Café; Lake

Forest Country Club; El Famous Burrito; Lake Forest Country Club; Gale Street Inn; Once Upon a Bagel; Kevin's Place; Holiday Inn Waukegan; Ten Mile House; Westleigh Road Foods; Quonset Tap; Tamales; Danish Home; Emily's; Happy Foods; Sunset Foods; Norton's; Go Bananas; Michael's Style Red Hots; Bent Fork; Mather; Grand Foods; Astoria Banquets; Gertrude B. Nelson; Norton's; Tacos El Norte (Libertyville); Tennaqua; and The Lotus Suites.

76. On information and belief, PFG had no relationships with these entities prior to Harris's and Fenton's solicitations of them.

**XVI. Harris's And Fenton's Unlawful Solicitations And Misappropriation Of US Foods' Proprietary And Confidential Information And Trade Secrets Have Caused US Foods To Lose Customers And Substantial Profits**

77. The value of the sales that PFG has obtained as a result of Harris's and Fenton's unlawful solicitation of clients away from US Foods already exceeds approximately $1 million, and US Foods continues to lose sales as a result of Defendants' unlawful conduct.

78. The following are the customers that Harris and Fenton have effectively solicited away from US Foods entirely as a result of Harris and Fenton inappropriate and unlawful use of US Foods' confidential and proprietary information: Kevin's Place; Gertrude B. Nelson; The Bent Fork; Tacos El Norte (Libertyville); Tamales; Tennaqua; Marcello & Father & Sons Group; The Lotus Suites; Quonset Tap; and Westleigh Road Foods.

79. In addition, US Foods has lost substantial sales for other customers as a result of Harris and Fenton inappropriate and unlawful use of US Foods' confidential and proprietary information, including the following examples: Emily's; Go Bananas; Michael's Style Red Hots; Anton's Fruit Ranch, Inc.; Happy Foods; Norton's; Gale Street Inn; and Something's Brewing.

**XVII. Harris And Fenton Solicited Additional US Foods Employees**

80.     On information and belief, in or about March 2015, Fenton and Harris solicited current US Foods Territory Manager Martin Cabrera to join PFG.

81.     On information and belief, since departing from US Foods, Fenton and Harris also solicited current US Foods Territory Manager Bob Wurtz to join PFG.

**COUNT I**
**(Breach of Customer Non-Solicit And Non-Disclosure**
**Agreement Against Harris And Fenton)**

82.     US Foods realleges and incorporates paragraphs 1 through 81, as though fully set forth herein.

83.     Harris and Fenton executed the Agreements in exchange for good and valuable consideration.

84.     The Agreements are valid and enforceable under Illinois law.

85.     The Agreements require the Harris and Fenton to refrain from soliciting customers they serviced on behalf of US Foods.

86.     Harris and Fenton have breached and continue to breach their Agreements by soliciting the above-referenced US Foods customers.

87.     Harris and Fenton have further breached and continue to breach their Agreements by taking, relying on and using US Foods' confidential information.

88.     US Foods has been and continues to be damaged as a result of the foregoing unlawful conduct.

89.     The disclosure of US Foods' confidential and proprietary information and trade secrets to PFG has caused and will cause irreparable injury to US Foods justifying entry of an injunction.

17

WHEREFORE, US Foods requests that:

- Harris and Fenton be enjoined from continuing to breach their customer non-solicit and non-disclosure obligations under the Agreements;

- Judgment be entered against Harris and Fenton, and that they be ordered to pay US Foods all the compensatory damages and interest to which it is entitled;

- Harris and Fenton reimburse US Foods for any and all attorneys' fees, costs and expenses incurred as a result of the wrongful conduct described herein, including such costs and fees incurred in this litigation; and

- This Court grant such other and further relief as it may deem just and equitable.

## COUNT II
### (Tortious Interference With Contract Against PFG And Harris)

90.    US Foods realleges and incorporates paragraphs 1 through 81, as though fully set forth herein.

91.    Harris and Fenton had valid and enforceable contracts with US Foods.

92.    US Foods expected (and expects) that the provisions of the Agreements, including the restrictive covenants therein, will be complied with without interference.

93.    On information and belief, PFG offered employment to Harris and Fenton with knowledge of the existence of their Agreements and with the intention of having them solicit contractually restricted customer accounts of US Foods.

94.    PFG intentionally and unjustifiably interfered with Harris's and Fenton's Agreements with US Foods by encouraging them to solicit restricted US Foods customers and rely upon US Foods' confidential information in doing so.

95.     Harris intentionally and unjustifiably interfered with Fenton's Agreement with US Foods by encouraging him to solicit restricted US Foods' customers and rely on US Foods' confidential information in doing so.

96.     PFG intentionally and unjustifiably interfered with Harris's and Fenton's Agreements with US Foods by encouraging and facilitating their ability to solicit US Foods employees in violation of their Agreements.

97.     As a direct and proximate result of PFG's and Harris's interference, US Foods has been substantially injured and damaged in amounts which must be determined at trial.  In the interim, PFG and Harris are earning profits at US Foods' expense as a result of their tortious interference.

WHEREFORE, US Foods respectfully requests that:

- Judgment be entered against PFG and Harris, and that they be ordered to pay US Foods compensatory and exemplary damages, and interest, to which it is entitled;

- US Foods be reimbursed by PFG and Harris for any and all attorneys' fees, costs and expenses incurred as a result of the wrongful conduct described herein, including such costs and fees incurred in this litigation; and

- This Court grant such other and further relief as it may deem just and equitable.

### COUNT III
### (Misappropriation Of Trade Secrets In Violation Of
### The Illinois Trade Secrets Act Against Harris, Fenton And PFG)

98.     US Foods realleges and incorporates paragraphs 1 through 81, as though fully set forth herein.

99.     The information described above constitutes trade secrets under the Illinois Trade Secrets Act ("ITSA"). 765 ILCS § 1065/1, *et seq.*  The information was and is secret.  US Foods

derives substantial economic value from its secrecy.  The information has been the subject of efforts that were and are reasonable under the circumstances to protect its secrecy.  As set forth above, US Foods has undertaken reasonable steps to ensure that this information remains secret. US Foods' confidential and proprietary information is not known to others in the industry or the general public.

100.    Harris and Fenton misappropriated US Foods' trade secrets when they took order, pricing and margin information from US Foods' computer and, on information and belief, in hard copy form, and when they used such information to solicit US Foods' customers.

101.    On information and belief, Harris's and Fenton's managers at PFG, including Tonozzi,  have caused or inevitably will cause them to rely on and misuse US Foods' trade secrets.

102.    PFG, at the direction of its management, including Tonozzi, knowingly and willfully directed the receipt and use of the US Foods' trade secret information taken by Harris and Fenton.

103.    At least one PFG manager has knowingly and willfully induced the receipt and inevitable disclosure of US Foods' trade secrets by, among other things, systematically hiring US Foods' employees.

104.    Defendants' use of US Foods trade secrets has caused and will continue to cause damage to US Foods.

105.    Defendants' conduct has been willful and malicious.  Accordingly, US Foods is entitled to exemplary damages pursuant to the ITSA.

106.    US Foods has incurred and will continue to incur attorneys' fees to enforce its rights under the ITSA to protect its trade secrets and confidential information from being

willfully and maliciously misappropriated by Defendants. Accordingly, US Foods should be awarded reasonable attorneys' fees in addition to monetary damages.

107.    The disclosure of US Foods' trade secrets to PFG has caused and will cause irreparable injury to US Foods justifying entry of an injunction.

WHEREFORE, US Foods requests that:

- Harris and Fenton be required to return US Foods' trade secrets to US Foods;

- Judgment be entered against Harris, Fenton and PFG, and that they be ordered to pay US Foods all the compensatory damages and interest to which it is entitled;

- Harris and Fenton reimburse US Foods for any and all attorneys' fees, costs and expenses incurred as a result of the wrongful conduct described herein, including such costs and fees incurred in this litigation; and

- This Court grant such other and further relief as it may deem just and equitable.

**COUNT IV**
**(Breach Of Employee Non-Solicitation Agreement Against Harris And Fenton)**

108.    US Foods realleges and incorporates paragraphs 1 through 81, as though fully set forth herein.

109.    Harris and Fenton executed the Agreements in exchange for good and valuable consideration.

110.    The Agreements are valid and enforceable under Illinois law.

111.    The Agreements require Harris and Fenton to refrain from soliciting US Foods employees for one year following the termination of their employment with US Foods.

112.    Harris breached his Agreement by soliciting Fenton to work for PFG.

113.    Harris and Fenton have breached and continue to breach the Agreement by soliciting Wurtz, Cabrera and Galanis to work for PFG.

21

114.    US Foods was irreparably damaged and also suffered severe financial damage as a result of the foregoing unlawful conduct.

WHEREFORE, US Foods requests that:

- Harris and Fenton be enjoined from continuing to breach their employee non-solicit obligations under the Agreements;

- Judgment be entered against Harris and Fenton and that they be ordered to pay US Foods all the compensatory damages and interest to which it is entitled;

- Harris and Fenton reimburse US Foods for any and all attorneys' fees, costs and expenses incurred as a result of the wrongful conduct described herein, including such costs and fees incurred in this litigation; and

- The Court grant such other and further relief as it may deem just and equitable.

## COUNT V
**(Violation Of The Computer Fraud And Abuse Act Against Harris And Fenton)**

115.    US Foods realleges and incorporates paragraphs 1 through 81, as though fully set forth herein.

116.    Harris and Fenton have violated the CFAA, 18 U.S.C. Section 1030(a)(2)(c) by intentionally, and with an intent to defraud US Foods, accessing US Foods' computers, connecting an unauthorized USB thumb drive to their US Foods computers, copying confidential and trade secret information from the computers onto thumb drives and improperly using and relying on that information and also transferring such information onto a non-US Foods computer(s).

117.    Harris' and Fenton's US Foods-issued computers qualify as protected computers under the CFAA, in that they were used to conduct interstate commerce and communication.

118.    Harris and Fenton without authorization and/or in excess of their authorized use attached the USB devices to their US Foods' computer and downloaded US Foods' information onto the USB Devices after they had decided to resign from US Foods and join PFG. Additionally, Harris emailed confidential and proprietary US Foods information to a personal email address after he decided to resign from US Foods and join PFG.  By taking US Foods' data on the USB Devices and via the emails after they knew they were going to resign their employment, Harris and Fenton accessed US Foods' computer without authorization or, alternatively, exceeded their authorized use.  Their authorization to access US Foods' computers would have been stopped earlier had US Foods known they planned to use the information in their work for a competitor.

119.    US Foods' loss exceeds $5,000, which amount is satisfied by the costs to US Foods in responding to the conduct described above through computer forensic investigation and retention of professionals to attempt to locate the date, time, manner and content of the theft and in pursuing its transmission, dissemination and return.

WHEREFORE, US Foods requests that:

- Harris and Fenton be enjoined from using or sharing any of US Foods' data and forced to return it to US Foods in all forms;

- Judgment be entered against Harris and Fenton and that they be ordered to pay US Foods all the compensatory damages and interest to which it is entitled;

- US Foods be reimbursed by Harris and Fenton for any and all attorneys' fees, costs and expenses incurred as a result of the wrongful conduct described herein, including such costs and fees incurred in this litigation; and

- This Court grants such other and further relief as it may deem just and equitable.

23

October 1, 2015

Nigel F. Telman
Steven J. Pearlman
Amanda C. Wiley
PROSKAUER ROSE LLP
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois 60602
(312) 962 3550
spearlman@proskauer.com

Respectfully Submitted,

**US FOODS, INC.**

/s/ Steven J. Pearlman
    Steven J. Pearlman